SO ORDERED.

SIGNED this 25th day of September, 2018.



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

PUBLISHED

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE:<br><br>**VICKY JO METZ,**<br>　　　　　　　Debtor. | Case No. 12-13120<br>Chapter 13 |
| IN RE:<br><br>**VICKY JO METZ,**<br>　　　　　　　Plaintiff,<br><br>vs.<br><br>**NAVIENT EDUCATION LOAN CORP<br>and EDUCATIONAL CREDIT<br>MANAGEMENT CORPORATION,**<br>　　　　　　　Defendants. | Adv. No. 17-5119 |

## MEMORANDUM OPINION

1

A student loan may be discharged in bankruptcy only if the payment of such loan would impose an undue hardship on the debtor.[1] Determining whether the hardship the student loan payment would impose is undue involves deciding three things: (1) is the debtor unable to make her student loan payments while maintaining a minimal standard of living; (2) is the debtor's present impecunious condition likely to persist during the loan repayment period; and (3) has the debtor made a good faith effort to pay? If the answers are yes, yes, and yes, the Court may discharge the loan. Vicki Metz borrowed $16,613 in student loans from 1989 to 1991. Though her lifestyle is, with a few exceptions, spartan, she has managed to make some payments. But with capitalized and accrued interest, she now owes over $67,277.88. Her earning power will likely remain static for now and when she reaches retirement age, it will diminish. Her payments have mostly come through a succession of three chapter 13 plans. She has not participated in the income-based payment programs offered by the Department of Education. Considering all the facts of Ms. Metz's case, the Court concludes that she can afford to repay the principal balance of the loan within a reasonable time, but she cannot hope to repay the capitalized interest and the new interest that would accrue on her student loan debt, and requiring her to remain liable for those consequences would be an undue hardship. Therefore, the principal balance of this claim, $16,613.73, is excepted from discharge, but the remainder of the debt is declared discharged.[2]

---

[1] 11 U.S.C. § 523(a)(8).
[2] Plaintiff Vicky Jo Metz appeared in person and by her attorney Martin J. Peck. Defendant Educational Credit Management Corporation appeared by its attorney N. Larry Bork. Defendant Navient Education Loan Corp did not appear.

**2**

Facts

From 1989 through 1991, Vicki Metz was a community college student, earning 50 credits, but no degree.[3] Over that time, she borrowed $16,613.73 in various types of student loans.[4] She consolidated those loans, signing an agreement with Student Loan Marketing Association, also known as "Sallie Mae," on March 28, 1994.[5] United Student Aid Funds, Inc., "USA Funds," guarantied her repayment of those loans and defendant Navient Education Loan Corporation serviced them. When this action was filed, USA Funds paid its guaranty obligation and was assigned the consolidated loans which it, in turn, assigned to defendant Educational Credit Management Corporation, or "ECMC."[6] Navient did not answer and apparently no longer has any interest in the loans or this proceeding. ECMC's declaration reflects that since 1994, Ms. Metz has paid a total of $14,789.02 toward the loan; $13,060.75 through chapter 13 administration. Despite that, Ms. Metz's student loan balance has only increased, ballooning to $67,277.88 as of July 1, 2018.[7]

Ms. Metz works as a community health worker for Sunflower Health Services, a subsidiary of Centene Management Corporation. Centene is a contractor for the State of Kansas, providing various services to the State concerning aging and disability services. She previously worked for the Kansas Department of Aging and Disability Services as a senior care administrator and, before that, spent 19 years

---

[3] Ms. Metz left school to raise her son and because she had difficulty with algebra.
[4] Ex. C.
[5] *Id.*
[6] Ex. B.
[7] The consolidated loan's interest rate is 9.0%.

**3**

working at the Kansas Department of Transportation. Over the past three years, Ms. Metz received gross annual pay ranging between $40,000 and $43,000. She expects to receive a merit raise this year and has received several in prior years. Ms. Metz is single, has no dependents, and was 59 at the time of trial. She doesn't believe her income potential will dramatically increase and I agree.

Ms. Metz's fortunes improved only marginally during her most recent chapter 13 case. When she filed in 2012, her scheduled gross monthly income was $3,500. That has grown to $3,800. She added vision and dental coverage, however, that increased her insurance premiums from $89 to $213. She borrowed from her 401(k) plan and, between repayment of that loan and regular retirement contributions, she contributes about $310 monthly toward retirement. Her monthly take home pay is presently $2,430 compared to what she scheduled in 2012, $2,230.[8] Ms. Metz's expenses have increased from the $2,076 she stated on Schedule J in 2012 to $2,323. Most of the increase can be explained by higher cable bills (+$91 for DirecTV), slightly higher car payments, and car and renter's insurance premiums. Ms. Metz currently withholds $772 each month for income taxes—she formerly withheld only $206. Last year she received a federal tax refund of $939. She received refunds in 2015 and 2016 of $1,067 and $1,135. Ms. Metz's checking account statements reflect that her pay is directly deposited. She makes most of her expenditures using a debit card or cash. Reviewing the two most recent account statements placed in evidence, I note that in

---

[8] ECMC's Exhibit H purports to be a table comparing Ms. Metz's pay and expenses now and when she filed. This table was created by comparing Ms. Metz's schedules I and J with her interrogatory responses in this litigation, Exhibit I. It contains a number of errors.

4

the November 2017 and February 2018 statements, food expenses (which I take to subsume groceries, dining out, liquor store, and pet food charges) exceed her $400 monthly budgeted amounts. The statements also reflect charges at fast food restaurants and a rare local casino visit. Her bank account is occasionally overdrawn. Her rent and car payments appear reasonable.

This is Ms. Metz's third chapter 13 case. Her first, in 2001, was filed as a chapter 13, but converted to chapter 7 in 2006, and she received a chapter 7 discharge.[9] She filed a second case shortly after that and I confirmed her chapter 13 plan. She completed it in December of 2011 and received a chapter 13 discharge.[10] Neither discharge affected ECMC's debt. She filed this case in 2012, completing her third chapter 13 plan in 2017 and again received a discharge. In her first case in 2001, Ms. Metz proposed a $100 monthly payment to ECMC's predecessor and the student loan creditor received $4,717. In the last two cases, she proposed that her student loan debt be paid pro rata with other unsecured creditors. In the second case, ECMC received $4,112 and, in the third, $4,230. In the 2001 case, Ms. Metz scheduled several secured and unsecured claims. Her second case included some priority tax debt. In the third and final case, this student loan was the only debt treated in the plan. Ms. Metz appears to have done a reasonable job of not incurring other debt.

ECMC states that Ms. Metz could have participated in a variety of income-based repayment plans and that she has chosen none of them. Those plans provide for a range of repayment options that would permit her to make monthly payments

---

[9] Case no. 01-10731.
[10] Case no. 06-12165.

**5**

from $203 to $508 a month. As the applicable regulations provide, she could make payments in an amount that would vary based upon the program she chose, her adjusted gross income, and whether her income was above or below the federal poverty level. She would be required to make payments for a maximum of 25 years (starting now—until she is 84) and whatever amount remained unpaid at the end would be forgiven.[11] I calculate that, at 9%, ECMC's claim accrues about $6,055 a year or $504 a month in accrued interest. A 25-year amortization of $67,277.88 at 9% yields a monthly payment of $564.60. If Ms. Metz could make the highest income-based payment ($508), that would not pay the loan in full within 25 years.[12] If she qualified for and agreed to pay the lowest available payment of $203, that would result in negative amortization of -$301 a month. If she made the $203 payment for 25 years, she would pay in $60,900, but adding in the accrued interest over that period, her debt would increase by $90,300, for a total forgivable amount of $157,277.88.[13] Ms. Metz notes that from 2011 to 2017, the provisions for income-based repayment have repeatedly changed, though usually to the benefit of student loan borrowers.[14]

---

[11] *See* ECMC Brief, p. 5 ("The maximum repayment period for the ICRP, IBR and the REPAYE is twenty-five (25) years. At the end of the twenty-five (25) year period, any portion of the loan that is remaining will be forgiven."). See also 34 C.F.R. §§ 685.208—209 (describing repayment plans generally and income-contingent repayment plans).

[12] The loan amount, amortized at 9% and paid at $503/month, pays the principal balance of the claim in full in about 27 years.

[13] $301 x 12 x 25 = $90,300.

[14] Exs. 7, 8, and 9 are copies of 34 C.F.R. § 685.221 (2011) (Income-based Repayment Plan), 34 C.F.R. § 685.209 (2017) (Income-Contingent Repayment Plan), and the 2008 version of 34 C.F.R. § 685.209.

**6**

This proceeding was tried on August 14, 2018 and both parties submitted trial briefs, discussing and applying the three-pronged undue hardship test to these facts.[15]

Analysis

In support of discharge, Ms. Metz argues[16] that not only can she not manage any of the payments posited by ECMC, but also that the payment plans are constantly changing, creating uncertainty about her future payment and tax liabilities. Oddly, she argues against partial discharge, stating that Congress could have provided for discharge "to the extent" that payment would result in undue hardship and didn't.[17] Finally, she cautions that the debt discharge income that the she might recognize when her loan is eventually forgiven might potentially bury her in another non-dischargeable obligation in the form of unpaid or unpayable income taxes, thwarting whatever fresh start she may gain by completing her chapter 13 plan.

ECMC notes that, with each passing iteration, the income-based payment programs become more favorable to debtors. It also notes that the tax consequences

---

[15] An adversary proceeding to determine the dischargeability of a particular debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I), over which this Court may exercise subject matter jurisdiction. 28 U.S.C. § 157(b)(1) and § 1334.

[16] Ms. Metz bears the burden of proving, by a preponderance of the evidence, that her student loan debt should be discharged because it would cause undue hardship. *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1309 (10th Cir. 2004).

[17] *See Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865, 866--67 (Bankr. W.D. Okla. 1996) (concluding that because the Bankruptcy Code authorizes discharge only of those "debts" that would impose an undue hardship, and a debt is defined as "liability on a claim," the plain meaning is that the entire liability is encompassed, "not merely some portion of the debt or merely selected terms of repayment" and noting that "Congress might have used language to authorize the discharge of partial liability or the modification of conditions of liability but did not").

**7**

of a debtor's receiving massive debt forgiveness would be ameliorated by the debtor's likelihood of being insolvent when the cancellation of debt income is realized. Finally, ECMC says that Ms. Metz's financial situation has only improved over the period from the inception of the loan to now and that she appears to be "complacent with her financial narrative."[18] ECMC emphasizes the extra money that Ms. Metz spends on herself, whether by consumption, over-withholding for income tax, or saving for her retirement. Between those sets of expenditures, ECMC claims that Ms. Metz could easily pay payments under one of the income-based plans available to her. ECMC says that Ms. Metz's prospects will only improve because, among other things, as her income drops in retirement, so will her payments, and that whatever remains unpaid will be forgiven.

I disagree with Ms. Metz that the changing income-based plans, standing alone, are a reason to discharge ECMC's debt. If she were to enter into a written consolidation and repayment agreement, it presumably would remain in effect so long as she complied with it, whether the Government changed the regulations later or not. And, I agree with ECMC that there is room in Ms. Metz's budget for her to pay something on this debt. But that "something" should have a meaningful positive effect on her financial situation. In other words, she should be able to reduce the debt—not simply service it.

*The Tenth Circuit Has Adopted the Brunner Test*

---

[18] ECMC Brief, p. 11.

Courts in the Tenth Circuit apply the *Brunner* test to determine whether making a debtor pay her student loans would impose an undue hardship.[19] The Tenth Circuit has interpreted *Brunner* to mean that the bankruptcy court must consider all the facts and circumstances concerning a debtor's situation when applying the test.[20] As the Circuit articulated in *Polleys*, the bankruptcy court should ask: Can the debtor maintain a minimal standard of living while repaying the debt? Is the debtor's impecunious state likely to persist over the repayment period? And, has the debtor made a good faith effort to repay the loan by minimizing expenses and maximizing income?[21] The Tenth Circuit has also indirectly addressed whether the bankruptcy court can partially discharge a student loan, holding in *Aldrete*, that a court couldn't grant a partial discharge absent applying *Brunner* to the partially discharged obligation and finding undue hardship.[22] Ms. Metz didn't request a partial discharge, but I feel bound to consider one on these facts.

*Minimal Standard of Living*

Ms. Metz can't maintain a minimal living standard unless a substantial portion of this debt is discharged. Evaluating the minimal standards test "necessarily entails an analysis of all relevant factors, including the health of the debtor and any of his dependents and the debtor's education and skill level."[23] As several other courts

---

[19] *See Polleys*, 356 F.3d at 1309 (citing *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2nd Cir. 1987)).
[20] *Id.*
[21] *Id.*
[22] *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1206–07 (10th Cir. 2005).
[23] *Polleys*, 356 F.3d at 1309.

**9**

have articulated, "minimal standards" for living in modern American society include the following:

> 1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.
>
> 2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.
>
> 3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.
>
> 4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.
>
> 5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.
>
> 6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.[24]

Ms. Metz appears to meet or exceed these minimum standards at present, though she appears to save more than would be necessary for "burials and final expenses" and enjoys more than "some small diversion or source of recreation." Ms. Metz is single, has no dependents, and lives alone. Her steady history of employment

---

[24] *Ivory v. United States* **(***In re Ivory***)**, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001).

**10**

suggests that she is a competent worker. Her income from Sunflower has grown year by year through merit raises. Ms. Metz rents a modest home, makes a small car payment ($313), and pays about $171 each month for cable TV and internet service.[25] Her "extravagances" are found by inspecting her checking account statements. She eats out at fast food places, buys cigarettes and liquor (totaling $166 on her November 2017 checking account statement). She spent $525 on groceries according to that statement. She visits the nearby casino occasionally. Her life style is more than "minimal," as described above, but not much more. The student loan debt is by far her largest obligation. And therein lies the problem: the test articulated by the Tenth Circuit asks "whether the debtor can maintain a minimal standard of living while repaying the debt."[26] And Ms. Metz cannot. As stated above, to retire the student loan debt, Ms. Metz would need to make a monthly payment of $564.60 for the next 25 years. Even stripped bare of anything other than her survival needs, Ms. Metz would not be able to pay such a large monthly sum, let alone maintain a minimal standard of living. If the test is whether she can make the $203 "pay as you earn" payment—and not service the debt at all, but instead yield a negative amortization of -$301 each month—then it appears that she could. But that should not end the discussion

---

[25] I do not share ECMC's view that the internet is a luxury—at least not in 2018. *See Russotto v. Educ. Credit Mgmt. Corp. (In re Russotto)*, 370 B.R. 853, 857 (Bankr. S.D. Fla. 2007) (stating that the court did not share the view "that internet access from home is a luxury or frivolity which is inherently unnecessary as part of a minimal standard of living").
[26] *Polleys*, 356 F.3d at 1309.

**11**

because *Polleys* requires me to look at *all* the facts and circumstances,[27] not just whether she can make the minimum payment today.

The likely long-term consequences to Ms. Metz of participating in the income-based repayment programs are also troubling. The Department of Education's regulations provide for her to make an annually adjusted monthly payment equal to 1/12 of her adjusted gross income minus 150% of the federal poverty line.[28] According to ECMC's affidavit, the lowest available income-based payment for Ms. Metz is $203 based on her current income. As noted above, this payment falls $301 short of paying the interest that accrues every month. The Secretary of Education may excuse the debtor's paying the interest shortfall for up to three years,[29] but the rest of the unpaid interest is capitalized into the principal balance of the loan when the debtor leaves the program or becomes able to pay it.[30] Likewise, all unpaid principal is deferred until the debtor leaves the program.[31] If after 25 years of payments, the loan hasn't been retired, it will be forgiven. The 25-year period begins on the date any payment has been made under any repayment plan after July 1, 1994.[32] The cancellation of this debt could result in Ms. Metz realizing up to $152,277.88 in cancellation of indebtedness income in the tax year the debt is forgiven. That could generate considerable tax liability for a retired 84-year-old living on social security.[33]

---

[27] *Id.*
[28] 34 C.F.R. §685.208(m).
[29] 34 C.F.R. §685.221(b)(3).
[30] 34 C.F.R. §685.221(b)(4).
[31] 34 C.F.R. §685.221(b)(5).
[32] 34 C.F.R. §685.221(f).
[33] *See* 26 U.S.C. §108 (governing income from discharge of indebtedness). And while I recognize all this is speculation about tax events 25 years in the future in a

**12**

Other courts reject "the availability of repayment plans as a basis for finding Debtors' net income to be sufficient to repay the loans while maintaining a minimal standard of living."[34] I agree. They also consider that the "dischargeability of student loans is not an all-or-nothing proposition."[35] Again, I agree. The Tenth Circuit in *Alderete* left that option open so long as the court finds that paying part of the loan would result in a debtor's incurring undue hardship.[36] Ms. Metz simply cannot maintain her minimal standard of living *and* pay the entirety of her student loan plus accrued interest. A $564.60 monthly payment is not feasible and would be an undue hardship. And if she paid the minimum due, she could theoretically pay as much as $60,900 over 25 years, almost as much as ECMC's total claim, and not only leave the principal untouched, but also be left owing $90,000 more than when she started. That's not a fresh start.[37]

---

relatively uncertain area of tax law, *see Johnson v. Sallie Mae, Inc. (In re Johnson)*, 577 B.R. 895, 905-06 (Bankr. D. Kan. 2017) (discussing potential future tax consequences of forgiveness of student loans), the very nature of the *Brunner* test is to speculate about Ms. Metz repayment abilities over the life of her loan. As discussed below, I find that she will no more likely be able to retire this debt in 25 years than she is now.

[34] *In re Murray*, 563 B.R. 52, 60 (Bankr. D. Kan. 2016), *aff'd sub nom. Educ. Credit Mgmt. Corp. v. Murray*, No. 16-2838, 2017 WL 4222980 (D. Kan. Sept. 22, 2017).

[35] *Id.* (citing the Tenth Circuit's *In re Alderete* decision for the proposition that a bankruptcy court may discharge the portion of student loan debt that meets the undue hardship test of 11 U.S.C. § 523(a)(8)).

[36] *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1207 (10th Cir. 2005).

[37] *See Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 308 B.R. 495, 503 (10th Cir. BAP 2004) (stating that the Tenth Circuit "makes it clear that it disdains 'overly restrictive' interpretations of this test, and concludes that it should be applied to further the Bankruptcy Code's goal of providing a 'fresh start' to the honest but unfortunate debtor." (internal quotation omitted)).

**13**

If Ms. Metz paid the minimum income-based program payment of $203 per month on the original balance of her student loan, $16,613.73 at 9%, the loan would pay out in 128 months (a little over 10.5 years). If she raised the monthly payment to $300, the original amount would be paid off in six years. Ms. Metz's budget and her expenditures suggests that she can trim her restaurant, recreation, and retirement expenses and, perhaps, adjust her tax withholding, to afford paying $200-300 a month on the principal portion of this debt—which would go a long way toward its retirement. As a result, I find that Ms. Metz has carried her burden to show that payment of anything but the original balance of her student loan ($16,613.73) would not permit her to maintain a minimal standard of living.

*Persistent Financial Condition*

Ms. Metz's financial situation is unlikely to change markedly, at least until she retires and becomes eligible to take Social Security, at which time her income will decrease, perhaps significantly. While it is always possible that her health may fail or that she may lose her job, Ms. Metz has little debt other than her student loan and few fixed expenses for necessities. Her retirement prospects may be limited due to her relatively small retirement fund and Social Security. Ms. Metz will simply never be able to afford to make a significant monthly payment on her student loan. There are no prospects of increased income or decreased expenses that could make that likely.[38] Even if her student loan payments were decreased to zero under an income-

---

[38] *See Buckland v. Educ. Credit Mgmt. Corp. (In re Buckland)*, 424 B.R. 883, 889-890 (Bankr. D. Kan. 2010) (stating that the second prong of the *Brunner* test required a "realistic look into the debtor's circumstances and the debtor's ability to provide for adequate shelter, nutrition, health care, and the like").

**14**

based repayment plan, she would only accrue more interest, inflating the forgivable balance. This is yet another reason to address the accrued interest in bankruptcy, not later.

*Prior Good Faith Efforts to Repay*

Has Ms. Metz made a good faith effort to repay by remaining employed, maximizing income, and minimizing expenses? Or has she contributed to her hardship?[39] As noted above, Ms. Metz made a few payments before her first bankruptcy case in 2001. She opted for the "interest-only" option when she consolidated the loans in 1994. While I understand her effort to save for retirement, her other monthly budgetary expenditures could be streamlined to accommodate some payment on this loan without significantly affecting her quality of life. Somewhere in the mix of life insurance, retirement savings, cable TV, dining out, and casino expenditures, Ms. Metz should be able to find the money to make some effort to service this loan. She has attempted to pay ECMC or its predecessors through her chapter 13 payments. She made nearly all the payments required in the 2001 case and completed both plans in her 2006 and 2012 cases. That is no mean feat and it shows that she intended to pay at least some of her student loan debt.[40] She has paid

---

[39] *Id.* at 890 (stating that the good faith inquiry is measured by a debtor's "efforts to obtain employment, maximize income and minimize expenses" and that "a debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his control").

[40] Regarding nondischargeability proceedings generally, exceptions to discharge should be narrowly construed, "and because of the fresh start objectives of bankruptcy, doubt as to the meaning and breadth of a statutory exception is to be resolved in the debtor's favor." *DSC Nat'l Properties, LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 168 (10th Cir. BAP 2012) (internal quotations and alterations omitted).

**15**

more than $14,000 toward this loan, not a dime of which has gone to principal. I conclude that she has made good faith efforts to repay the loan, but that her prospects of paying all of it are hopeless.

Conclusion

All but the original principal balance of the 1994 consolidated loans should be discharged. Requiring Ms. Metz to pay the accrued interest would result in undue hardship to her now and in the future. Rather than be yoked to a pay-as-she-earns time bomb, Ms. Metz should instead be required to pay the principal balance of the loan, $16,613.73. Doing that would not impose an undue hardship on her within the meaning of § 523(a)(8). Therefore, that amount is excepted from her discharge in this case and the rest of her student loan debt is discharged. Ms. Metz should arrange to make a monthly payment that will amortize that debt over a reasonable 5 to 10-year period.

###